UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIM. NO. 14-295 (SRN/JSM) |
| Plaintiff, | REPORT AND RECOMMENDATION |
| v. | |
| MARTEL JAVELL EINFELDT, | |
| Defendant. | |

JANIE S. MAYERON, United States Magistrate Judge

The above matter came before the undersigned United States Magistrate Judge on Defendant's Motion to Suppress Statements [Docket No. 20] and Defendant's Motion to Suppress Evidence Obtained in Search [Docket Nos. 19, 26]. David P. Steinkamp, Assistant U.S. Attorney, appeared on behalf of the Government. Jeff DeGree, Esq. appeared on behalf of defendant, who was personally present. This matter has been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

**I.   FACTUAL BACKGROUND**

Defendant has been indicted on one count of being a Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Defendant has moved to suppress physical evidence obtained in a vehicle search which took place on June 25, 2014, as well as statements made by defendant to Brooklyn Park Detective Suerth on June 26, 2014. [Docket Nos. 19, 20, 26].

A. **Hearing Testimony**

On December 3, 2014, the Court conducted an evidentiary hearing and took testimony from Officer Sean Michael Drew of the Brooklyn Park Police Department. Officer Drew testified as follows:

On the night of June 25, 2014, Officer Drew and Officer Marah of the Brooklyn Park Police Department were on patrol near an apartment complex located three to five blocks from XXXX Idaho Avenue in Brooklyn Park, Minnesota. The two officers had been informed that several armed robberies had occurred in the area on recent nights.

Prior to his shift on June 25, 2014, Officer Drew had received the following information concerning defendant from various crime intelligence briefings:

- Defendant was an active member of the 1-9 Block Dipset gang, which had a violent rivalry with another gang, the Taliban;

- Members of the 1-9 Block Dipset gang frequently carried guns in their vehicles;

- Defendant was a felon with a prior conviction for robbery;

- Defendant lived at XXXX Idaho Avenue North, Brooklyn Park, Minnesota; and

- Defendant's brother, Kentrell Einfeldt, had been robbed at gunpoint on June 24, 2014.

Officer Drew testified that he could identify defendant prior to June 25, 2014, based on a photo of defendant that was included in the crime intelligence reports. Officer Drew also stated that the fact that defendant's brother had been robbed at gunpoint the previous night heightened Officer Drew's suspicions concerning defendant. Based on his training, Officer Drew was concerned that there would be retaliation for the robbery because of Kentrell Einfeldt's relationship to defendant, a known gang member.

At around 9:50 p.m. on June 25, 2014, as Officers Drew and Marah were exiting their squad car to conduct foot patrol near XXXX Idaho Avenue, they saw an orange Saturn vehicle pass by.  Officer Drew observed that the passenger headlight of the vehicle was burned out, which was an equipment violation under Minnesota law.  Officer Drew also saw defendant sitting in the passenger seat of the vehicle.  Both officers immediately returned to the squad car and began to follow the Saturn.  As the officers followed, they observed the Saturn make a left turn without signaling 100 feet prior to the turn—also a violation of Minnesota traffic laws.  The officers activated the squad car's emergency lights and trained a spotlight on the Saturn.  Officer Drew testified that he then saw defendant move down and forward in his seat.  When Officer Drew observed this movement, he remarked, "He's juking," which meant that defendant was moving around excitedly.[1]  Officer Drew was concerned that defendant might be concealing a gun.

As the Saturn pulled to a stop, Officer Marah exited the squad car and approached the driver side of the Saturn, while Officer Drew approached the passenger side.  Officer Marah asked the driver, Kentrell Einfeldt, for his driver's license and proof of insurance.  Defendant told the officers that he was on probation and had to be home by 10:00 p.m. to make curfew.[2]  As Officer Marah was interacting with Kentrell Einfeldt, Officer Drew shined his flashlight through the passenger side window.  Officer Drew testified that every time he aimed his flashlight under the seat, defendant would move

---

[1]   Officer Drew testified that he pays special attention to the movements of passengers when he is pulling over a vehicle, looking for anything that would pose a threat to officer safety.

[2]   According to the squad video, defendant made this statement at 9:51 p.m.

his left hand down toward the floor. Based on defendant's movements, Officer Drew suspected that defendant was attempting to conceal a weapon. Officer Drew then walked back toward the squad car and radioed for backup. When he returned to the passenger side of the Saturn, he resumed illuminating the area under the passenger seat. As he did so, he noticed that defendant kept moving his feet around the area underneath the seat.

At 9:54 p.m., Officer Yang of the Brooklyn Park Police Department arrived on the scene in his squad car. At that time, Officer Drew opened the passenger door of the Saturn and removed defendant from the vehicle to frisk him for weapons. Officer Drew did not place defendant in handcuffs.

As Officer Drew was frisking defendant, Officer Yang shined his flashlight through the open passenger side door[3] and spotted a black and silver handgun. Both defendant and Kentrell Einfeldt were arrested for illegal possession of a handgun.

At the hearing, defendant stipulated to the following facts: After defendant was arrested, he was taken to the police station and questioned. During the interview, defendant gave a statement, which he now moves to suppress as a fruit of an illegal arrest. However, defendant did not contend that the interview itself was illegal.

    **B.**    **Motion to Suppress and Government Response**

In support of his motion to suppress, defendant argued as follows:

> Here, the circumstances do not justify the extension of the length of the detention or the removal of [defendant] from the vehicle for a pat down search. The alleged furtive

---

[3] The passenger side door had been left open after Officer Drew removed defendant from the vehicle to frisk him.

> movements are non-existent. Defendant can be seen clearly throughout the video, talking directly with both officers.
>
> Further, the officer took over three minutes before removing [defendant]. During this time they laughed and joked with he [sic] and the driver. They playfully referred to his [sic] "an old lady" and his early curfew. At times, they walked away from the occupants while turning their back. At no time is any nefarious conducted [sic] observed. At no time do the officers appear worried for their safety. To the contrary, they are casual and laughing. During this time, the officers tried to find something they suspected, without case [sic], was present in the vehicle by looking through the windows with flashlights. When this failed, they resorted to "furtive movements" and "officer safety" concerns.

Defendant's Memorandum in Support of Motion to Suppress, p. 3 [Docket No. 39].

In response, the Government argued that the length of the traffic stop was not extraordinary and was directly related to the initial purpose of the stop. Government's Response to Defendant's Memorandum in Support of Motions to Suppress, pp. 4-5 [Docket No. 40]. The Government also contended that, based on the totality of circumstances, Officer Drew had a reasonable, articulable suspicion that defendant possessed a weapon before he removed defendant from the Saturn, and that he was properly removed from the car to be frisked. Id., pp. 6-7. Further, the Government asserted that after defendant was removed from the vehicle, the handgun was in Officer Yang's plain view, and therefore, he was legally entitled to seize it. Id., p. 8. Finally, because the search and seizure of the gun was proper, there was no basis for suppressing any statement given by defendant after his arrest. Id.

## II. DISCUSSION

### A. <u>Legal Standard</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and it requires probable cause for lawful searches and seizures. U.S. Const. amend. IV; <u>see</u> <u>also</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 230, 235 (1983). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." <u>United States v. Vore</u>, 743 F.3d 1175, 1179 (8th Cir. 2014) (quoting <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967) (footnote omitted)).

"'[A]n officer may, consistent with the Fourth Amendment conduct a brief investigatory stop when the officer has reasonable articulable suspicion that criminal activity is afoot.'" <u>United States v. Cotter</u>, 701 F.3d 544, 547 (8th Cir. 2012) (quoting <u>Illinois v. Wardlow</u>, 528 U.S. 119, 123 (2000)). "During an investigative stop, officers should 'employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose' of the stop." <u>United States v. Donnelly</u>, 475 F.3d 946, 953 (8th Cir. 2007) (quoting <u>United States v. Navarrete-Barron</u>, 192 F.3d 786, 790 (8th Cir. 1999)). "'A detention may become a <u>de facto</u> arrest if it lasts for an unreasonably long time, but there is no rigid time limit on an investigatory detention.'" <u>Williams v. Decker</u>, 767 F.3d 734, 741 (8th Cir. 2014) (quoting <u>United States v. Maltais</u>, 403 F.3d 550, 556 (8th Cir. 2005)); <u>see</u> <u>also</u> <u>United States v. Donnelly</u>, 475 F.3d 946, 953 (8th Cir. 2007) ("An investigative detention may turn into

an arrest if it 'lasts for an unreasonably long time or if officers use unreasonable force.'") (quoting United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999)); United States v. Aquino, 674 F.3d 918, 924 (8th Cir. 2012) ("[W]here an officer exceeds the permissible scope of Terry, the investigatory detention is transformed into an arrest.") (citing Peterson v. City of Plymouth, Minn., 945 F.2d 1416, 1419 (8th Cir. 1991)). "In determining whether a detention is too long to be justified as a Terry stop, we consider whether the officers 'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" United States v. Morgan, 729 F.3d 1086, 1090 (8th Cir. 2013) (quoting United States v. Sharpe, 470 U.S. 675, 686 (1985)). This will depend on "'the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.'" Decker, 767 F.3d at 741 (quoting Sharpe, 470 U.S. at 685)). "There is no bright line rule; instead, 'common sense and ordinary human experience must govern over rigid criteria.'" Morgan, 729 F.3d at 1090 (quoting Sharpe, 470 U.S. at 685)).

In addition, officers are generally permitted to "take any additional steps 'reasonably necessary to protect their personal safety and maintain the status quo during the course of a stop.'" United States v. Walker, 555 F.3d 716, 721 (8th Cir. 2009) (quoting United States v. Hensley, 469 U.S. 221, 235 (1985)). Consequently, during an investigatory stop, "if the officer reasonably believes the person with whom he is dealing is armed and dangerous, he is permitted to conduct a protective search of the person's outer clothing, and any weapons seized as the result of such a search 'may properly be introduced in evidence against the person from whom they were taken.'" Id. (citing Terry, 392 U.S. at 30-31); see also United States v. Preston, 685 F.3d 685, 689

(8th Cir. 2012) ("There is an exception to the warrant requirement that permits a limited search for a weapon if there is a reasonable suspicion that the suspect is armed and poses a danger to officers or others.") (citing Terry, 392 U.S. at 29); United States v. Hughes, 517 F.3d 1013, 1016 (8th Cir. 2008) ("'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.'") (quoting Minnesota v. Dickerson, 508 U.S. 366, 373 (1993)).

"In determining whether reasonable suspicion exists, we consider the totality of the circumstances in light of the officers' experience and specialized training." Preston, 685 F.3d at 689 (quoting United States v. Davis, 457 F.3d 817, 822 (8th Cir. 2006)). "'[T]he officer need not be absolutely certain that the individual is armed . . . .'" Cotter, 701 F.3d at 547 (quoting Terry, 392 U.S. at 27). Rather, the test is whether "a 'reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" Preston, 685 F.3d at 689 (quoting United States v. Horton, 611 F.3d 936, 941 (8th Cir. 2010)) (internal quotation marks omitted). "In examining the relevant facts and inferences, we must keep in mind that 'minimally intrusive weapons searches' at traffic stops will more likely be reasonable because of the 'inherent danger' of traffic stops." Id. (quoting United States v. Shranklen, 315 F.3d 959, 962 (8th Cir. 2003)) (internal quotation marks omitted).

"If, however, the officers conduct an illegal search or detention, physical evidence from the search as well as verbal evidence obtained from the detention must be

8

excluded as the 'fruits' of the officers' unlawful action. Cotter, 701 F.3d at 547 (citing Wong Sun v. United States, 371 U.S. 471, 484-85 (1963)).

**B.    Analysis**

As a threshold matter, the Court finds that the traffic stop of defendant was not unreasonably long. Officers initially stopped defendant because the vehicle in which he was riding had a non-functioning headlight and failed to signal properly.[4] During the stop, officers collected the occupants' identification and insurance information. Officers also questioned the occupants as to their destination, place of residence, and whether they were going to fix the burnt out headlight. There was nothing out of the ordinary about this exchange. From the time of the initial stop until the time defendant was removed from the vehicle, only three minutes passed. Even for a minor traffic violation, this time was reasonably necessary to effectuate the purpose of the stop. Further, Officer Marah was still in the process of collecting information when Officer Drew initiated the frisk. In short, there is no evidence that the officers artificially prolonged the traffic stop.

The Court also finds that officers had a reasonable suspicion that defendant possessed a weapon, and therefore, they were justified in removing him from the car to perform a pat down search of his person.

Before encountering defendant on June 25, 2014, Officer Drew knew that defendant was a member of the 1-9 Block Dipset gang, which had a violent rivalry with another gang involving guns. Officer Drew also knew that defendant had a prior conviction for aggravated robbery. In addition, Officer Drew knew that Kentrell Einfeldt,

---

[4]   Defendant did not challenge the legality of the initial stop.

defendant's brother, had been robbed at gunpoint the previous night. Based on this information, Officer Drew had already begun to formulate suspicions that defendant would be armed that night.

Defendant's actions during the traffic stop bolstered Officer Drew's suspicions that defendant was armed. After the squad's lights were activated and before the Saturn was stopped, Officer Drew testified that he could see defendant slumping down, which caused him concern that defendant might be concealing a weapon.[5] Further, after the traffic stop was accomplished and Officer Drew was standing beside the passenger side of the Saturn where defendant was seated, each time Officer Drew shined his flashlight under the passenger seat, defendant shielded the area with his left hand or feet. Officer Drew found this to be highly suspicious.

Based on all of these facts and the totality of circumstances, a reasonable officer could believe that defendant was armed, and therefore, removal of defendant from the car for the purpose of conducting a pat down search of defendant was justified. Once defendant was removed from the car, Officer Yang's observation through the open passenger door of a handgun underneath the passenger seat was proper based on the plain view doctrine.[6] See United States v. Banks, 514 F.3d 769 (8th Cir. 2008) ("Police may seize, without a warrant, an item that is 1) in plain view 2) when it is observed from a lawful vantage point, 3) where the incriminating character of the item is immediately apparent.") (citing Horton v. California, 496 U.S. 128, 136-37 (1990)).

---

[5] In the squad video, at the point Officer Drew stated "He's juking," defendant's head can be seen moving side to side. However, due to the low quality of the video, it is not possible to verify Officer Drew's testimony as to defendant's movements.

[6] Defendant did not challenge the seizure of the gun itself. Rather, he contended that the seizure was a fruit of an illegal stop.

For all of these reasons, this Court finds that the traffic stop and ultimate seizure of the handgun from the vehicle was proper. Further, having determined that the seizure of the weapon was valid, the Court finds there is no basis for suppressing any statement defendant may have made or given to law enforcement following his arrest. Defendant's motions to suppress evidence and statements should be denied.

## III.    RECOMMENDATION

It is hereby RECOMMENDED that Defendant's Motion to Suppress Statements [Docket No. 20] and Defendant's Motion to Suppress Evidence Obtained in Search [Docket Nos. 19, 26] be **DENIED**.

Dated: December 16, 2014

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

## NOTICE

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **December 30, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under this Rules shall be limited to 3500 words. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.